UNITED STATES of America,
Plaintiff–Appellee,

v.

Jo Lynn PATTY, Defendant–Appellant.

No. 92–5078.

United States Court of Appeals,
Tenth Circuit.

April 27, 1993.

1046

Frank M. Hagedorn, James J. Poszek, and Claire V. Eagan, of Hall, Estill, Hardwick, Gable, Golden & Nelson, Tulsa, OK, for defendant-appellant.

Tony M. Graham, U.S. Atty., Susan W. Pennington, Asst. U.S. Atty., Tulsa, OK, for plaintiff-appellee.

Before TACHA, BALDOCK and KELLY, Circuit Judges.

BALDOCK, Circuit Judge.

Defendant Jo Lynn Patty appeals the restitution portion of her sentence, claiming that the district court improperly included attorney fees and prejudgment interest in its restitution order as to certain victims, that the government failed to show that Defendant's fraudulent acts caused some of the victims' losses, and that the sentencing court abused its discretion in determining that Defendant had the ability to pay the restitution award. We have jurisdiction under 18 U.S.C. § 3742(a).

From the time she was twenty until the businesses declared bankruptcy seventeen years later, Defendant was responsible for the day-to-day operations of two businesses owned by her father—Patty Precision Products Company ("Patty Precision") and Vogue Coach Company ("Vogue"). Defendant served as officer and director of Patty Precision, a manufacturing company which contracted with the United States Department of Defense. Defendant also served as officer and director of Vogue, which constructed and sold luxury motor homes. Patty Precision and Vogue filed bankruptcy in October and November 1990.

The record on appeal reflects that Defendant, who had sole responsibility for the negotiation of government contracts and bank loans, began to defraud the Department of Defense and various financial institutions when Patty Precision and Vogue began experiencing financial difficulties. On January 10, 1991, the grand jury indicted Defendant on three counts of fraud. Counts one and two alleged that from August 1986 to May 1990, Defendant knowingly and willfully made false or fraudulent claims upon and against the United States Department of Defense in violation of 18 U.S.C. § 287. Count three charged that from June 1990 to August 1990, Defendant knowingly and willfully executed a scheme to defraud WestStar Bank ("WestStar"), a federally insured financial institution, by means of false and fraudulent representations in violation of 18 U.S.C. § 1344.

Defendant pleaded guilty to all three counts. In exchange for Defendant's guilty plea, the government agreed not to charge her with defrauding two other federally insured financial institutions. Defendant further agreed that by pleading guilty, she was admitting that she had committed fraudulent acts involving the victims named in the indictment—*i.e.*, the Department of Defense and WestStar—and also that she had committed fraudulent acts against two other federally insured financial institutions, First National Bank of Pryor [1] ("First Pryor") and

---

1. The loans issued by First National Bank of Pryor were offered jointly with the Oklahoma Ordnance Works Authority. Therefore, restitu- tion amounts to First Pryor included restitution to the Ordnance Works Authority.

Fourth National Bank ("Fourth National"), as well as two other financial entities, General Electric Capital Corporation ("General Electric") and Transamerica Finance Company ("Transamerica"). Defendant additionally agreed that she would pay restitution to all of the entities that she admitted to defrauding, including those not named in the indictment, and that total restitution would not exceed $25,000,000.

On March 30, 1992, Defendant was sentenced to 33 months imprisonment, three years supervised release, and payment of restitution in the amount of $7,644,498.04, payable during the period of incarceration and supervised release. Defendant's assets at the time of sentencing included $240 cash, a 1983 Cadillac valued at $2,800, real estate with a market value of $70,000, and life insurance policies with a cash value of $28,950, for a total of $101,990. Defendant had liabilities totaling more than $3,261,000. Based on these figures, Defendant had a deficit net worth of approximately $3,159,000. She had been forced into Chapter 7 bankruptcy proceedings by her creditors in December 1990. Defendant is a high school graduate with 100 college hours, and her only employment has been as manager and director of her father's companies. She earned $73,000 in 1988 as manager of these companies, and $40,000 in 1990. Since Patty Precision and Vogue declared bankruptcy in October and November 1990, Defendant has been unemployed with no source of income other than unemployment benefits. The district court, after recognizing that Defendant presently did not have sufficient assets to pay the restitution in full, found that "her employment history, her talent, [and] her ability would indicate that she has above average income potential," and

therefore, indicated that she had the ability to pay the entire amount of restitution.

Defendant does not contest the amount of restitution owed to the Department of Defense, except with regard to her ability to pay the award. She does, however, contest the amounts owed to WestStar, First Pryor, Fourth National, and General Electric because they included attorney fees and prejudgment interest. Additionally, she contests the amounts owed to WestStar, First Pryor, Transamerica, Fourth National, and General Electric because she claims the government failed to prove by a preponderance that her fraudulent acts caused the calculated losses.

I.

We first address Defendant's assertion that the sentencing court improperly included attorney fees and prejudgment interest in her restitution obligations to some of the victims. In Defendant's presentence report, the probation officer listed the net losses incurred as a result of the fraudulent loans by WestStar, First Pryor, Transamerica, Fourth National, and General Electric. At the conclusion of the presentence report, the probation officer made restitution recommendations based on forms submitted by these five victims. The restitution recommendations were higher for each victim, with the exception of Transamerica, than the calculated net losses listed earlier in the presentence report.[2] Defendant objected to this discrepancy, and the government responded that the recommended restitution amount added attorney fees and prejudgment interest to the net losses listed earlier in the presentence report. Defendant made no further arguments to the sentencing court regarding the

2. The discrepancy between net losses listed in the first portion of the presentence report and restitution recommended (and later awarded by the court) in the last portion of the presentence report was as follows:

| Financial Entity | Net Loss | Restitution Recommended |
|---|---|---|
| WestStar | $1,148,413.00 | $1,438,650.12 |
| First Pryor | 1,665,161.00 | 1,823,513.00 |
| Transamerica | 1,590,800.00 | 1,590,800.00 |
| Fourth National | 624,695.00 | 793,816.98 |
| General Electric | 913,976.00 | 1,272,794.94 |

With restitution ordered payable to the Department of Defense in the amount of $744,922.84, Defendant's total restitution was $7,664,498.04.

discrepancy but now argues on appeal that the restitution award improperly included attorney fees and prejudgment interest.

▮ Although Defendant failed to specifically object to the inclusion of attorney fees and prejudgment interest, we address these issues because the imposition of an illegal restitution order constitutes plain error. *United States v. Herndon*, 982 F.2d 1411, 1420 (10th Cir.1992) (citing *United States v. Wainwright*, 938 F.2d 1096, 1098 (10th Cir.1991)). Under the plain error standard, we will not review a district court's factual findings relating to sentencing, *United States v. Saucedo*, 950 F.2d 1508, 1518 (10th Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 1343, 122 L.Ed.2d 725 (1993), but will review for "particularly egregious" or "obvious" and "substantial" legal error, which our failure to consider would result in a "miscarriage of justice." *Id.* at 1511, 1516–17. *See also United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985).

### A.

▮ There must be "specific statutory authority for an award of attorney[ ] fees and expenses." *United States v. Diamond*, 969 F.2d 961, 968 (10th Cir.1992). Under the Victim Witness Protection Act ("VWPA"), 18 U.S.C. §§ 3663–3664, a victim can recover only those losses "sustained by any victim as a result of the offense," 18 U.S.C. § 3664; *see also Hughey v. United States*, 495 U.S. 411, 418, 110 S.Ct. 1979, 1983, 109 L.Ed.2d 408 (1990), or as we defined in *Diamond*, 969 F.2d at 968, those expenditures that are "directly related" to the defendant's criminal conduct. *Diamond* states:

> In the absence of specific statutory authority for an award of attorney's fees and expenses, we believe *Hughey* is decisive as it limits the substantive boundaries of restitution under the VWPA to the specific conduct underlying the offense of conviction. 495 U.S. at 413, 110 S.Ct. at 1981. Expenses generated in recovering a victim's losses, therefore, generally are too far removed from the underlying criminal

conduct to form the basis of a restitution order. Accordingly, we hold the fees and expenses accrued in liquidating [defendant's company] are not recoverable in restitution, particularly where the government concedes the expenses were not directly related to the criminal conduct for which [defendant] was convicted.

*Diamond*, 969 F.2d at 968. We construe *Diamond* as holding that attorney fees incurred by the victim to recover his property are not directly related to the defendant's criminal conduct and thus are not recoverable in restitution under the VWPA. *See id.* at 968. *See also United States v. Mullins*, 971 F.2d 1138, 1147 (4th Cir.1992); *United States v. Arvanitis*, 902 F.2d 489, 497 (7th Cir.1990); *United States v. Walker*, 896 F.2d 295, 307 n. 26 (8th Cir.1990); *United States v. Barany*, 884 F.2d 1255, 1261 (9th Cir. 1989), *cert. denied*, 493 U.S. 1034, 110 S.Ct. 755, 107 L.Ed.2d 771 (1990); *United States v. Mitchell*, 876 F.2d 1178, 1184 (5th Cir.1989). There may be a situation, however, where attorney fees under the VWPA are directly related to a defendant's criminal conduct because they were "sustained by [the] victim as a result of the offense." 18 U.S.C. § 3664. *See also Diamond*, 969 F.2d at 968. These attorney fees would be recoverable in a VWPA restitution order. Because we cannot discern from the record the nature of the attorney fees in this case, we remand with instructions to the district court to subtract from the restitution obligation any attorney fees not directly related to Defendant's criminal conduct.

### B.

▮ Defendant also contends that the sentencing court erred when it included prejudgment interest in her restitution obligation. Unlike the attorney fee analysis which starts from the premise that fees are not recoverable unless provided by statute, *Diamond*, 969 F.2d at 968, silence in a statute as to prejudgment interest need not be interpreted "as manifesting an unequivocal congressional purpose that the obligation shall not bear interest." *Rodgers v. United States*, 332 U.S. 371, 373, 68 S.Ct. 5, 7, 92

L.Ed. 3 (1947). Because the VWPA neither expressly allows or forbids the inclusion of prejudgment interest, we must test whether such interest should be included in a VWPA restitution award by appraising "the congressional purpose in imposing [the obligation] [ ] in light of general principles [we] deem[ ] relevant." *Id.*

In *Rodgers,* the Supreme Court applied this test to the Agricultural Adjustment Act of 1938, which imposed a fine payable to the government for failure to follow the Act's requirements. The Court concluded that because the purpose of a fine is to punish or deter and not to raise money for the government, interest was improper. *Id.* at 374. Two circuits have applied the *Rodgers* test to determine whether it is proper to include prejudgment interest in a restitution award under the VWPA, and both have concluded that the purpose of the VWPA is best served by the inclusion of prejudgment interest. *See United States v. Smith,* 944 F.2d 618, 626 (9th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1515, 117 L.Ed.2d 651 (1992); *United States v. Rochester,* 898 F.2d 971, 982–83 (5th Cir.1990). We agree with their reasoning.

Unlike the statute in *Rodgers* which served only to deter prohibited conduct, the purpose of restitution under the VWPA is "to ensure that wrongdoers, to the degree possible, make their victims whole." *Rochester,* 898 F.2d at 983. *See also Smith,* 944 F.2d at 626. Prejudgment interest reflects the victim's loss due to his inability to use the money for a productive purpose, and is therefore necessary to make the victim whole. This is especially true when, as in this case, the victim is a financial institution because "[f]oregone interest is one aspect of the victim's actual loss." *Smith,* 944 F.2d at 626.[3] We hold that prejudgment interest is properly included in a VWPA restitution award.

Because the sentencing court failed to specify which portion of the WestStar, First Pryor, Fourth National, and General Electric

restitution awards constituted attorneys fees and which portion constituted prejudgment interest, we must remand for this determination. On remand, the attorney fees must be subtracted from Defendant's restitution obligation unless they are found to be directly related to Defendant's criminal conduct.

## II.

■ Defendant next asserts that the government failed to show that her criminal conduct—*i.e.,* filing false financial documents—caused the losses to WestStar, First Pryor, Transamerica, Fourth National, and General Electric. Rather, Defendant contends that Patty Precision and Vogue's declaration of bankruptcy actually caused the losses. We find *Hughey v. United States,* 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990), and *United States v. Diamond,* 969 F.2d 961 (10th Cir.1992), instructive.

In *Hughey,* the Court held that "the language and structure of the [VWPA] make plain Congress' intent to authorize an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction." *Hughey,* 495 U.S. at 413, 110 S.Ct. at 1981. We have interpreted *Hughey* to mean that a restitution order which includes losses "stemming from charges not resulting in [a] conviction[ ]" violates the VWPA. *Diamond,* 969 F.2d at 965; *United States v. Wainwright,* 938 F.2d 1096, 1098 (10th Cir.1991). This precedent would dictate that Defendant cannot be ordered to pay restitution to any victims other than WestStar and the Department of Defense (the only victims named in her counts of conviction); however, Congress amended the VWPA after *Hughey* to permit courts to "order restitution in any criminal case to the extent agreed to by the parties in a plea agreement." Crime Control Act of 1990, Pub.L. No. 101–647, § 2509, 1990 U.S.C.C.A.N. (104 Stat.) 4789, 4863 (1990) (codified at 18 U.S.C. § 3663(a)(3)). Defendant does not dispute the fact that she

---

**3.** *United States v. Sleight,* 808 F.2d 1012 (3d Cir.1987), prohibiting prejudgment interest in Federal Probation Act ("FPA") restitution awards, 18 U.S.C. § 3651 (repealed Nov. 1, 1987), is distinguishable. The primary purpose

of restitution under the FPA was to punish, making restitution under the FPA more akin to a fine, and thus not recoverable under the *Rodgers* test. *Rochester,* 898 F.2d at 983.

agreed to pay restitution to entities other than the Department of Defense and West-Star, but she does argue that she did not agree to pay restitution to these victims in excess of the losses caused by her criminal conduct.

In her plea agreement, Defendant agreed that she would pay restitution in an amount not to exceed $25,000,000. She did not agree, however, to relieve the government of its burden of proving that her restitution obligation included only those losses caused by her criminal conduct. *See Diamond*, 969 F.2d at 967 (burden rests with government to show false reports, rather than other conduct leading to insolvency, resulted in loss recoverable through restitution). Therefore, although Defendant could be ordered to pay restitution in an amount up to $25,000,000, she could not be ordered to pay restitution in excess of those losses which the government proved were the result of her fraudulent acts. *See United States v. Herndon*, 982 F.2d 1411, 1420 (10th Cir.1992) (explaining *Diamond* as holding that it is error for the government to "fail[ ] to differentiate between losses caused by the false reports and losses caused by bad business practices").

█ It is clear from the record that Defendant's fraudulent acts caused the losses to First Pryor,[4] Transamerica and General Electric. Defendant filed false reports, invoices, vehicle identification plates, and manufacturer's statements of origin to obtain these loans. *See Diamond*, 969 F.2d at 966 (submission of false reports as a condition to obtaining a loan causes the loss for the entire loan).

█ As to WestStar, Defendant alleges that her sole fraudulent conduct was her submission of an otherwise accurate financial report which falsely represented that it was prepared by well-respected financial auditor Coopers and Lybrand. Defendant asserts that, because submission of this report was Defendant's only fraudulent conduct with regard to WestStar and because the report allegedly was materially correct, the district court improperly found that submission of this report caused the loss. We reject this argument, because even if the financial information was materially correct, it is unlikely that WestStar would have issued the loans if it had known that Defendant had prepared the report herself, rather than Coopers and Lybrand; therefore, Defendant's misrepresentation was material. *See United States v. Rackley*, 986 F.2d 1357, 1361–62 (10th Cir. 1993) (non-disclosure was material in bank fraud case because bank agents would not have approved the loans if information had been disclosed).

█ It is also clear from the record that her fraudulent acts caused the $624,695 loss to Fourth National. Although Defendant obtained the Fourth National loan without using fraudulent means, the presentence report states that she submitted a fraudulent report "to induce the bank to advance funds and/or release collateral."[5] Submission of false reports as a condition of keeping an already-existing loan does not necessarily cause the loss of the entire loan. *Diamond*, 969 F.2d at 966. However, Fourth National was not requesting restitution for the entire loan, but only the amount of the losses resulting from the advance of funds or release of collateral induced by Defendant's fraudulent conduct. Therefore, the district court correctly included these losses, in the amount of $624,695, in Defendant's restitution obligation.

---

4. This loan was issued jointly with the Oklahoma Ordnance Works Authority and losses were in the amount of $1,665,161. *See supra* notes 1, 2.

5. Under Fed.R.Crim.P. 32, a defendant must challenge at sentencing any alleged factual inaccuracies in the presentence report. *United States v. Amos*, 984 F.2d 1067, 1072 n. 5 (10th Cir. 1993) (citing *United States v. O'Dell*, 965 F.2d 937, 938 (10th Cir.1992). Absent such a challenge, the sentencing court can rely on any uncontested facts contained in the presentence report without requiring production of evidence. *Id.* Because Defendant failed to challenge the presentence report's factual assertion that she submitted a fraudulent report "to induce the bank to advance funds and/or release collateral" as required by Fed.R.Crim.P. 32(c)(3)(A), she waived her right to challenge this fact on appeal. *O'Dell*, 965 F.2d at 938. Unlike legal issues relating to a restitution award which we will review for plain error, *Herndon*, 982 F.2d at 1420, this factual issue is inappropriate for plain error review. *United States v. Saucedo*, 950 F.2d 1508, 1518 (10th Cir.1991), *cert. denied*, — U.S. ——, 113 S.Ct. 1343, 122 L.Ed.2d 725 (1993).

## III.

 Defendant's final argument is that the sentencing court abused its discretion in determining that she had the ability to pay the restitution award. In reviewing a district court's finding that a defendant has the ability to pay a particular amount of restitution, we must accept the district court's underlying factual findings unless clearly erroneous and review the amount of the order for an abuse of discretion. *See United States v. Grimes,* 967 F.2d 1468, 1473 (10th Cir.), *cert. denied,* ── U.S. ──, 113 S.Ct. 355, 121 L.Ed.2d 269 (1992). "[W]hen a district court orders restitution it must be consistent with a defendant's ability to pay." *United States v. McIlvain,* 967 F.2d 1479, 1481 (10th Cir.1992) (citations omitted). Although "[a] defendant's present indigency does not bar a restitution order where the evidence indicates a defendant has some assets or earning potential" to pay the amount ordered, *id.* (citations omitted), we will not uphold the district court's exercise of discretion if the record is devoid of any evidence that the defendant is able to satisfy the restitution order. *Grimes,* 967 F.2d at 1473. "The potential for repayment cannot be based on mere chance." *McIlvain,* 967 F.2d at 1481 (citations omitted).

As the district court recognized, Defendant's liabilities, notwithstanding the restitution award, greatly exceed her present assets; accordingly, Defendant has no present ability to pay $7.6 million in restitution. As to Defendant's future earning capacity, the record does not support the district court's finding that she has the ability to pay the amount of restitution ordered. Defendant, whose only employment has been with her father's now bankrupt businesses, has never earned more than $73,000 in one year. Even assuming she could earn an equivalent salary after she serves her prison sentence, it would take over 100 years for her income to reach the level of restitution ordered, and she has only three years after serving her term of imprisonment within which to pay all restitution installments. *See United States v. Rogat,* 924 F.2d 983, 986 (10th Cir.) (must be within realm of possibility for defendant to pay restitution within time limit), *cert. denied,* ── U.S. ──, 111 S.Ct. 1637, 113 L.Ed.2d 732 (1991). Furthermore, although we are aware that Defendant has filed bankruptcy, her liabilities at the time of sentencing exceeded $3.2 million. Clearly, under these facts, Defendant has no ability to pay $7.6 million in restitution either presently or in the next five years and nine months. *See McIlvain,* 967 F.2d at 1481 (abuse of discretion to find defendant, who had no assets, no steady employment, no source of income, a high school education, debt of $700, lived with his mother, and had sought Aid to Families with Dependent Children, had ability to pay $160,248 in restitution); *Grimes,* 967 F.2d at 1473 (abuse of discretion to find defendants with "dismal" personal finances, such as judgments against them, closed checking accounts for numerous overdrafts, repossessed car, and $2200 monthly income, had ability to pay $128,279.05 in restitution); *United States v. Kelley,* 929 F.2d 582, 587 (10th Cir.) (nothing in presentence report to support district court's finding of ability to pay $192,092 in restitution because defendant was sixty years old, had little work experience, and had no present assets), *cert. denied,* ── U.S. ──, 112 S.Ct. 341, 116 L.Ed.2d 280 (1991). Therefore, the district court's finding to the contrary was an abuse of discretion.[6] While Defendant has the ability to pay some restitution, the district court abused its discretion in ordering Defendant to pay $7.6 million restitution, and we re-

---

6. We distinguish Defendant's ability to pay from the defendants in *United States v. Morrison,* 938 F.2d 168 (10th Cir.1991) and *Rogat,* 924 F.2d 983. In *Morrison,* we upheld a defendant's restitution obligation because he had a college degree, had successfully operated numerous supermarkets and convenience stores, and had imagination and skills that could be applied to legal endeavors. *Morrison,* 938 F.2d at 172. However, the defendant's restitution award in *Morrison* was only $613,765, considerably less than Defen-

dant's $7,644,498.04 award. *Id.* at 171. In *Rogat,* we upheld two defendants' combined restitution obligations totalling $2,449,142.48, significantly less than Defendant's. Furthermore, the *Rogat* defendants had already established a new advertising and sales business and their combined average adjusted gross income for the years preceding their indictment was $122,704. Here, Defendant has no employment prospects, and her income for the year preceding the indictment was one third of the Defendants' in *Rogat.*

mand the "ability to pay" issue to the district court for further consideration.

REVERSED and REMANDED for proceedings consistent with this opinion.